IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LARRY M. BANKS, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) Case No. 12 C 2341 |
| COOK COUNTY and SHERIFF THOMAS DART, | ) ) ) ) |
| Defendants. | ) ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Larry Banks, who at the time was a pretrial detainee in the Cook County Jail, filed this *pro se* lawsuit in late March 2012. He paid the filing fee in full.

Banks initially sued Chicago Mayor Rahm Emanuel, the City of Chicago, Cook County Board President Toni Preckwinkle, Cook County, and Sheriff Thomas Dart. His complaint concerned the quality of drinking water at the Jail. Banks alleged that the water had "little particles" in it and that "[e]very time I drink the water I get headaches, dry mouth, cold and hot flashes, weight loss, sleep deprivation / psychological [symptoms]." Compl. ¶¶ 12 & 16. Banks alleged that in response to grievances, he was told by Jail officials that "it's not on Cook County that the water is poisonous." *Id.* ¶ 11. Banks further alleged that the Jail's water is supplied by the City and that "it is common knowledge that the water coming from Lake Michigan isn't safe to drink." *Id.* ¶ 15. He cited an article from the Chicago Sun Times and unidentified studies and alleged that he and others at the Jail are at serious risk of harm. He stated that the

defendants had turned a blind eye to this problem. Banks attached to his complaint a response to a grievance in which a Jail official stated that the water is provided by the City's water department and that the Jail has no reason to believe that the water does not comply with state and federal water quality standards.

The Court reviewed Banks's complaint as required by the Prison Litigation Reform Act, 28 U.S.C. § 1915A. On April 12, 2012, the Court entered an order dismissing the complaint without prejudice. The Court concluded that Banks's claim that the water supplied to the entire city (including the Jail) is unsafe was not plausible and that his allegations of "extreme and immediate medical issues" caused by the water "defie[d] logic and reason." Order of Apr. 12, 2012 at 1. The Court stated that unless Banks submitted, by May 7, 2012, a motion to amend with an amended complaint stating a plausible claim, the Court would enter final judgment. *Id.*

In response, Banks submitted an amended complaint that abandoned his claims about water quality at the Jail and asserted completely different claims relating to alleged violations of his right to practice his religion and his inability to receive a diet consistent with his religion. At the same time, he filed a motion asking to "drop the suit against Mayor Emmanuel [sic] et al. without prejudice." *See* dkt. no. 9. The Court granted the latter motion and dismissed the case, advising Banks that he could not use this case to assert completely unrelated claims. *See* Order of May 4, 2012.

On May 16, 2012, Banks submitted a motion to reopen the suit and, two weeks later, submitted a proposed second amended complaint. He dropped the City and Mayor Emanuel as defendants and named only the County, President Preckwinkle, and Sheriff Dart. In this version of the complaint, Banks said the water "comes out [of] the

sink brown, and is undrinkable at times." 2d Am. Compl. at 4.  He said that the water caused him to break out with rashes, dry mouth, and boils.  He alleged that in response to grievances, Jail officials said the water was from Lake Michigan and that any problems were the City's fault.  Banks alleged that Jail officials were aware the water was undrinkable but had turned a blind eye.  Banks stated, "the water has different items in it that make it unsafe to drink.  I had the water tested myself, and it came back with different poisons in it.  I have the test to submit as evidence."  *Id.* at 5.

The Court assessed Banks's second amended complaint in an order dated October 9, 2012.  The Court noted Banks's statement that he had tested the water and relied on it to conclude that "it is plausible that some defect at the Jail is causing contamination of the water."  Order of Oct. 9, 2012 at 1.  The Court dismissed Preckwinkle as a defendant due the fact that the Jail is run by the Sheriff, not the County Board, but permitted the case to proceed against Sheriff Dart and the County.  *Id.*

As the case progressed, Banks filed a motion in February 2013 asking to have independent testing done of the water.  His motion alleged:

> 1.   Plaintiff had the water tested before, and the water came back with 30 different item [sic], which cause cancer.
>
> 2.   Plaintiff shows the court that a second test has been tested, and it [sic] the same thing, which cause cancer.
>
> 3.   Plaintiff need [sic] the court to allow an agency of my choosen [sic] to come into Cook County, and get the water tested from my room, because, it's the water that [sic] coming out of [sic] sink, and shower areas of the Jails. . . .

Mot. to Have Water Tested (etc.) ¶¶ 1-3 (dkt. no. 42).  Banks offered to pay for the testing himself.

3

Defendants objected to Banks's motion.  They cited his earlier allegations that he had tested the water twice and said that the proposed third test was "repetitive and unnecessary because he already had the water tested, as represented to the Court.  Furthermore, Plaintiff claims that he already has water test results to present as evidence."  Defs.' Resp. to Pl.'s Mot. to Have Water Tested at 1 (dkt. no. 47).  Defendants also argued that allowing outside persons access to a jail cell would pose a risk to institutional safety.  *Id.* at 2.  Defendants closed by saying, "Either Plaintiff has misrepresented to the Court that he already had the water tested twice and that he has the test results or Plaintiff is improperly seeking repetitive and unnecessary discovery as a way to harass Defendants and threaten the security of the Cook County Jail."  *Id.*

Banks filed a reply in mid-March 2013.  With regard to the availability of his earlier alleged tests, Banks stated:

> Plaintiff had the water tested, and the water items were place [sic] in an individual [sic] hands, which is no longer in communication with the Plaintiff any longer.  Plaintiff states that [defendants' attorney] misspeaks when she said I had the water tested two times.  I'm paying for the tests to be done by a private company, and this bears no cost against Cook County Jail nor the State Attorney's Office.

Pl.'s Resp. to Defs.' Resp. at 1-2.  Banks disputed defendants' claims regarding security (noting, among other things, that outside pest control workers come into the Jail frequently), and he said "[t]he reason I want to choose the company [to do the testing] is so that I may have a company who has nothing to hide or lie about."  *Id.* at 2.

Shortly after this, Banks's pending criminal case concluded, and he was taken to the Illinois Department of Corrections to serve a short amount of additional time.  In late May 2013, the Court entered an order ruling on a number of discovery-related motions filed by the parties, including the water testing motion.  *See* Order of May 22, 2013.  On

4

that motion, the Court stated,

> The Court grants this motion, subject to making appropriate arrangements. The fact that plaintiff claims he has already had the water tested (defendants' main argument against the motion) is not a dispositive factor, given the time interval that has passed since that testing allegedly was done. The Court acknowledges defendants' security concerns but believes that it is possible to make appropriate arrangements for testing by some person or entity not connected with Cook County, the Sheriff, or the Department of Corrections. The Court expects plaintiff to propose an arrangement to defendants promptly and expects both sides to act in good faith to discuss any such proposal and attempt to reach an accommodation.

*Id.* at 2.

On June 12, 2013, the Clerk received from Banks a motion to compel and for sanctions in which he contended that defendants' attorney was refusing to cooperate with his efforts to make arrangements for the water testing the Court had ordered. *See* dkt. no. 72. It is unclear when Banks sent the motion, though it is obvious that he did so prior to June 12. Defendants responded to the motion on June 24, 2013. They noted that the communications about testing had come from a man named David Olsson who was purportedly acting pursuant to a "power of attorney" from Banks. Defendants argued that Banks's authorization did not permit Olsson to act for Banks but said that their counsel had nonetheless identified, and had described to Banks in writing, the procedures any outside testing company would have to follow in order to be allowed into the Jail to conduct testing of the water. *See* dkt. no. 75 at 2-3 & Ex. B. Given these efforts on their part, defendants asked the Court to sanction Banks for filing what they called a "baseless discovery motion[ ] on a whim." Defense counsel's letter to Banks, however, was itself dated June 12—the same date that the Clerk had received Banks's motion to compel—meaning that Banks could not possibly have received it before he

5

filed his motion to compel.

Sometime in or about July 2013, Banks was released from prison. Before the Court had an opportunity to rule on his motion to compel, defendants filed, on July 24, 2013, a motion to dismiss based upon alleged fraud on the Court. The motion discussed a series of orders the Court had entered in other cases filed by Banks against the County, the Jail, and/or Jail personnel, in which the Court had found that Banks had submitted false statements under oath in connection with requests to proceed *in forma pauperis* and had dismissed certain of those cases. *See* Defs.' Mot. to Dismiss for Fraud on the Court at 1-2 (dkt. no. 83). More to the point, defendants stated that they had "reason to believe that Plaintiff intentionally lied to the Court that he had the water tested at the jail on two previous occasions and that the test results showed that the water was poisonous" and that, "to conceal his initial lie, Plaintiff further lied to the Court at a status hearing that he no longer has possession of these test results because he gave them to an unidentified person." *Id.* at 2. Defendants said they were unaware of any water testing done by Banks and stated that "[a]s an inmate at the CCDOC, Plaintiff could not have collected water samples and tested the water at the jail without CCDOC's knowledge." *Id.* at 3. They noted that they had served discovery requests on Banks seeking information about the testing and results but had received no responses, and that when they inquired further, Banks said he had never received the requests.

In his response to the motion, Banks addressed each of defendants' allegations. Among other things, he expressed reluctance to describe further how he had done the earlier water testing, "because to do so would implicate inmates and jail personnel . . . ." Pl.'s Combined Verified Resp. in Opp. to Defs.' Mot. to Dismiss at 7 (dkt. no. 90). Banks

6

also argued that defendants were trying to avoid the Court's order permitting further testing of the water at the Jail. He asked the Court to impose sanctions on defendants' counsel.

After receiving defendants' reply, the Court entered an order, dated October 11, 2013, in which it directed Banks to respond to certain discovery requests by defendant asking for information about the water tests he said he had done. *See* Order of Oct. 11, 2013 at 1-2. Banks filed responses as ordered. He stated:

> Plaintiff used a Pro-Lab Water Quality Test Kit; the Kit provides test strips for exposure to the target water supply and is used to test for, among other things, the following: PH (Acidity); Total Chlorine; Total Alkalinity; Total Hardness; Hydrogen Sulfide; Iron; Copper; Nitrates; Nitrites; Iron Bacteria [sic]; and lead. I instructed Officer Johnson lgt [sic], Sgt. Crump, and other officials how to obtain the test and convey it to Plaintiff and to whom the results would be given for removal from the Jail facility. Records will show movement of the testing items to these individuals. Plaintiff performed the test at his cell sink location; Division 5 nursing station; cell 4D8, Division 5; and Cermak Hospital. I subsequently mailed the results to my stepbrother Nayya Amud, aka F.E. Michael ("Michael"), in Atlanta, Georgia for safekeeping.

Pl.'s Resps. to Discovery as Ordered by the Court at 1-2 (dkt. no. 97). With regard to the results of the tests, Banks stated:

> As best Plaintiff could decipher, the water test results showed levels of iron bacteria, total chlorine, hydrogen sulfide, nitrates, nitrites, and lead in excess of the acceptable range for potable water. Upon information and belief, the foregoing substances are poisonous when in excess of the acceptable and safe range when testing.

*Id.* at 2. In response to defendants' request for documents concerning the testing, Banks stated:

> To the best of Plaintiff's recollection, the water test strips from the water testing kit comprise the extent of documentation regarding the water test Plaintiff conducted. As previously stated, the strips exposed to the water and used for test purposes were mailed to Michael in Atlanta, Georgia for safekeeping purposes. Plaintiff is not in possession of such exposed

7

> strips at the present time, if in fact such comprises "documentation," for purposes hereof. From time to time during his multi-year incarceration, Plaintiff initiated "work orders" for correcting the manifest water problem. Curiously, such work orders and copies thereof seem to have mysteriously disappeared.

*Id.* at 3.

In further briefing, defendants contended that Banks's response showed that his earlier statement to the Court (when he sought independent water testing) that his own testing had shown thirty cancer-causing substances in the water was false. Defendants also argued that Banks's statement regarding how the testing had been accomplished was "incredible" and should not be believed. They argued further that Banks had shown no reason why he could not get the purported test result materials back from his stepbrother. Defendants again requested dismissal of the case based on alleged fraud by Banks. *See* Defs.' Suppl. Reply (dkt. no. 99). Banks argued in a surreply that he had done what the Court requested and that defendants were simply trying to avoid the further testing the Court had authorized. *See* Pl.'s Surreply (dkt. no. 101). Defendants then filed a supplemental reply in which they reminded the Court of Banks's false statements in other cases regarding his financial condition. *See* Defs.' 2d Suppl. Reply (dkt. no. 102).

The Court set defendants' motion to dismiss for an evidentiary hearing, *see* Order of Dec. 4, 2013, and held that hearing on December 19, 2013. Banks was the only witness to testify at the hearing; neither he nor defendants asked to call any other witnesses. In his testimony, Banks described how he had gone about doing the testing he had previously reported. Banks stated that he discussed the poor water quality at the Jail with a Lt. Johnson, who was a ranking officer in the tier where Banks was

8

housed. Banks had read articles regarding water quality in Cook County and said he told Lt. Johnson that if the drinking water at the Jail was bad, correctional officers might be able to sue as well. Olsson, who was working with Banks, identified a type of water testing kit called a "Pro Test" kit. Banks said that Lt. Johnson agreed to bring Banks a test kit of this type. (Banks brought a new version of the same type of kit to the hearing, and photographs of it have been made part of the record.) The kit includes test strips that test for pH, alkalinity, chlorine, hardness, hydrogen sulfide, iron, copper, nitrates, nitrites, and bacteria (either 10 or 11 items, depending on how one counts). Banks testified that he tested the water from the sink in his cell, the shower, and a sink near the shower. He said the tests came back positive for all of the substances tested. Banks said he told Johnson the results and mailed the test strips to his stepbrother Frank Michaels in Atlanta. Banks later confirmed with Michaels by phone that he had received the test strips.

Banks said he later obtained another test kit of the same type from a sergeant at the Jail named Crump. He stated that Crump told him that Johnson had advised repeating the test, because some Jail guards were thinking of filing suit. This time, Banks tested the water in his cell, the shower, and a sink in a holding area where detainees are kept when being transported from place to place. Banks said the tests were again positive for all substances tested. He stated that he again sent the test strips to Michaels. He does not know if Michaels received them.

Banks said that he had not checked back with Michaels more recently to find out if he still has the test strips. He said that Michaels had moved and had financial difficulty and that they were not in contact.

9

During questioning by defendants' counsel, it was pointed out that the Pro Test testing kit that Banks said he had used does not contain a test for lead, one of the substances Banks had previously represented had been part of his testing. Rather, the test kit includes a coupon to obtain a separate test kit for lead. Banks did not testify that he had obtained a lead test kit.

Asked to identify the basis for his previous contentions regarding cancer-causing substances in the Jail's water, Banks said that this came from an EPA report that he had obtained via Olsson. When asked more pointed questions about his prior contention (in his motion for independent testing) that his *own testing* had showed the water contained thirty different items that cause cancer, Banks gave a somewhat rambling response, stating:

> A: I was more specific because a few tests one item, you know what I'm saying. One item, you know what I'm saying, can have 30 different, you know what I'm saying, chemical components with it. So when you saying if I tested it, yeah, them, 11 things can have 30 different things in it.
>
> When I brung this to the attention and I did my research, what I did the research was on was based on everything that I collected—I'm sorry—everything I collected around, you know what I'm saying, the investigation on what I was doing.
>
> And as I told Judge Kennelly, when I first did this, my lawsuit was against the city of Chicago. So when I, you know what I'm saying, filed my first complaint, that's when I brung the 30 different issues in there about the chemicals.
>
> Then when I did my second amended complaint, the reason why I put the same thing in there, because I was told by the Courts numerous times that you don't change anything out of your complaint because if you do and you leave it out, then what happens then is that you waived that.
>
> . . .
>
> Q: So you just testified right now, you wrote that your test results found 30 different cancer-causing items in it because there's 30 different cancer-

causing items in the 11 items that you tested?

A: No. That ain't what I testified.

Dec. 19, 2013 Tr. at 27-29.

## Discussion

Defendants focus on two statements, or sets of statements, made by Banks to the Court. The first is his claim to have done water testing while he was incarcerated at the Jail. The second is his statement that the testing showed that there were thirty different dangerous substances in the Jail's water.

**1. Banks's statements that he tested the water at the Jail**

Banks's original complaint did not contain an allegation that he had performed his own testing of water at the Jail. He first made such an allegation when he sought leave to reinstate the case and file his second amended complaint. As previously noted, in the second amended complaint, Banks stated, "the water has different items in it that make it unsafe to drink. I had the water tested myself, and it came back with different poisons in it. I have the test to submit as evidence." 2d Am. Compl. at 5.

Defendants have consistently argued that Banks's statement that he was able to do water testing at the Jail is not believable, because there is no way that he could have gotten testing materials into the Jail. Defendants offered no evidence on this score, however. Contrary to defendants' contention, there is nothing inherently incredible about Banks's contention in the Court's view. Any judicial officer who deals frequently with detention facilities quickly becomes aware that problems with smuggling of contraband (unauthorized items) are routine. And there are plenty of instances in the historical record where correctional officers have assisted in bringing outside items in for

11

inmates.  In short, Banks's allegations are not inherently improbable.

Banks has told, over an extended period, a consistent story about doing water testing at the Jail.  The Court does not find that story to be incredible.  Even after Banks named the Jail personnel who he said assisted him, defendants offered no contrary evidence—which, if it existed, plainly was available to them, given that Banks identified correctional officers as well as the tier where he was housed when he conducted the testing.  In short, the Court is not persuaded by defendants' contention that Banks's statements that he did testing are not worthy of belief.  Defendants bear the burden of proof on their allegation of fraud, and they have not carried it on this particular point.

The Court acknowledges that Banks has, in a number of other instances, made misrepresentations to the Court regarding his financial resources (and otherwise) so that he could proceed with other lawsuits *in forma pauperis* (*i.f.p.*).  This Court has made several findings adverse to Banks in this regard.  *See Banks v. Gonzalez*, No. 10 C 4122, Order dated May 16, 2011; *Banks v. Cook County*, No. 12 C 5726, Memorandum Opinion and Order dated Apr. 29, 2013; *Banks v. Muhammad*, No. 12 C 2493, Memorandum Opinion and Order dated Oct. 15, 2013; *Banks v. Mansour*, No. 12 C 2493, Order of Dec. 14, 2012.  Those matters provide good reason to be skeptical of Banks's credibility, and the Court has taken them into account in that regard.  But they do not warrant a conclusion that everything Banks says is a lie.   Nor does Banks's misconduct in these other cases provide, by itself, an appropriate basis to dismiss this case.  Banks never sought to proceed *i.f.p.* in this case; he paid the filing fee when he filed the suit (indeed, the payment of the filing fee here was one of the facts that led to inquiry into the veracity of his statements about his finances in other cases).

## 2. Banks's statement about what his water testing showed

The other statement by Banks that defendants challenge is the one he made when he moved the Court for permission to conduct a new, independent test. As previously noted, Banks stated:

> 1. Plaintiff had the water tested before, and the water came back with 30 different item [sic], which cause cancer.
>
> 2. Plaintiff shows the court that a second test has been tested, and it [sic] the same thing, which cause cancer.
>
> 3. Plaintiff need [sic] the court to allow an agency of my choosen [sic] to come into Cook County, and get the water tested from my room, because, it's the water that [sic] coming out of [sic] sink, and shower areas of the Jails. . . .

Mot. to Have Water Tested (etc.) ¶¶ 1-3 (dkt. no. 42).

The evidence shows that Banks's statement in the motion that he had conducted testing that showed thirty cancer-causing substances in the water that cause cancer was untrue. Banks cannot dismiss this, as he seemed to want to do during his testimony at the evidentiary hearing, by saying that he was talking not about his own testing but about information he had obtained via other research. That is not what he represented in his motion. Rather, the motion clearly and unmistakably said that *his testing* showed thirty substances, and that these substances cause cancer.

Both parts of Banks's statement were untrue. The only testing Banks did—indeed, the only testing he now even claims to have done—tested for, at most, 11 substances. And none of the testing that he did was for carcinogens.

The Court also finds that Banks's statement in his motion for testing was made knowingly or at least with reckless disregard for whether it was true or false. As the Court has noted in other cases, Banks may not be a highly educated person, but he is a

13

very experienced litigant. And by the time he filed that motion, he had already been sanctioned twice, via the Court's orders in Case Nos. 10 C 4122 (dated May 16, 2011) and 12 C 2493 (dated December 14, 2012), for making false statements to the Court. Thus he was fully attuned to the need to be accurate in papers he filed with the Court. As a result, Banks cannot credibly attribute his false statements in the motion to ignorance or honest mistake.

The remaining question involves the appropriate sanction for Banks's knowingly false representations to the Court. A court has the inherent authority to sanction a litigant for bad faith conduct during litigation. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991). Before a court sanctions a litigant, it must find that the litigant "willfully abused the judicial process or otherwise conducted litigation in bad faith." *See, e.g., Salmeron v. Enter. Recovery Sys., Inc.*, 579 F.3d 787, 793 (7th Cir. 2009); *Methode Elecs., Inc. v. Adam Techs., Inc.*, 371 F.3d 923, 928 (7th Cir. 2004). That is the case here. Banks deliberately made false statements to the Court in order to obtain further testing.

The Court's authority to sanction a litigant for misconduct "must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44. A sanction must be proportionate to the wrongdoing. *See, e.g., Williams v. Adams*, 660 F.3d 263, 265-66 (7th Cir. 2011). The Court's authority includes, however, the power to dismiss a lawsuit in an appropriate case. *Chambers*, 501 U.S. at 45.

"As a fraud on the court, perjury may warrant the sanction of dismissal." *Montano v. City of Chicago*, 535 F.3d 558, 564 (7th Cir.2008); *see also, Jackson v. Murphy*, 468 Fed. Appx. 616, 619-20 (7th Cir. 2012) (collecting cases). Banks' false

14

statements were not perjury strictly speaking, because they were not made under oath. That said, the wrongdoing was every bit as severe as false testimony would have been, because Banks made his false statements to the Court in an effort to convince it to order more testing.[1]

Dismissal may be too severe a sanction in a case in which a litigant's false statements were harmless to the litigation or were quickly discovered, or where other parties to the case also committed similar misconduct. *See Jackson*, 468 Fed. Appx. at 620; *Allen v. Chicago Transit Auth.*, 317 F.3d 696, 702 (7th Cir. 2003). Banks's falsehood, however, was not harmless. The Court relied on it in granting his request for additional testing. And the Court's order, in turn, led to further proceedings, when Banks alleged that defendants were not cooperating in carrying out the order. Nor was Banks's falsehood about the nature of the testing quickly brought to light; extensive briefing, followed by an evidentiary hearing, was required. Finally, there is no evidence of any sort of similar misconduct by defendants connected with the prosecution of Banks's suit.

In assessing whether dismissal is too severe a sanction, the Court also takes into account Banks's extensive history of litigation-related misconduct. Though the Court has some sympathy for Banks given his lengthy incarceration in a maximum-security facility like the Jail and the difficult conditions he likely faced there, the Court would be hard-pressed to imagine a litigant who has been sanctioned for misconduct as often as Banks. Earlier, less severe, sanctions, like those the Court imposed in the *Banks v.*

---

[1] The circumstances suggest that Banks had become aware by that point that the evidence supporting his earlier testing was missing (a point he did not disclose to the Court at the time), so he needed new testing to support his case. This provided a motive for Banks to exaggerate what his earlier testing had shown.

15

*Gonzalez* and *Banks v. Mansour* suits, appear to have had no deterrent or otherwise salutary effect on Banks. He continued to make misrepresentations to the Court, including those in the present case, even after being brought to book for his previous wrongs.

For these reasons, the Court concludes that the appropriate sanction for Banks's knowing misrepresentations to the Court is dismissal of this lawsuit with prejudice. No further costs will be imposed, because dismissal with prejudice is a sufficient penalty.

**Conclusion**

For the reasons stated above, the Court grants defendants' motion to dismiss for fraud on the court [dkt. no. 83]. The Clerk is directed to enter judgment dismissing this action with prejudice. All remaining motions are terminated as moot [dkt. nos. 70, 72 & 80].

_____
            MATTHEW F. KENNELLY
            United States District Judge

Date: February 18, 2014